FILED

2026 Mar-13 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BREANNA L. DOBBINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  2:25-cv-00038-HNJ |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Breanna Dobbins seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding her claim for a period of disability and disability insurance benefits.  (Doc. 1).  The undersigned carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 8).

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would

prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education, and past work experience, that the claimant can perform other work. *Id.* § 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g).

3

If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings … 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole … to determine if the decision reached is reasonable … and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla,' … [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Breanna Dobbins was 32 years old on September 30, 2023, the date on which she last met the insured status requirements of the Social Security Act. (Tr. 127, 147). She filed an application for disability and disability insurance benefits on either July 25, 2022, or August 17, 2022, alleging disability as of August 10, 2021. (Tr. 123, 328).[2] On April 18, 2023, the Commissioner denied the application. (Tr. 235-39). Dobbins requested reconsideration, which the Commissioner denied on October 26, 2023. (Tr. 241-44). Dobbins timely filed a request for a hearing before an administrative law judge (Tr. 252), and the ALJ held a hearing on March 20, 2024. (Tr. 156-83).

On May 23, 2024, the ALJ issued an unfavorable decision denying Dobbins's claim. (Tr. 120-49). Applying the five-step sequential process, the ALJ found at step one that Dobbins had not engaged in substantial gainful activity between her August 10, 2021, alleged onset date, and her September 30, 2023, date last insured. (Tr. 127). At step two, the ALJ determined Dobbins manifested the severe impairments of depression, anxiety, panic disorder, plantar fascial fibromatosis, lumbar degenerative

---

[2] Dobbins's disability application summary states she initiated contact with the Social Security Administration on August 17, 2022, and she alleged she became unable to work due to disability on September 29, 2017. (Tr. 328). During the administrative hearing, the ALJ stated he addressed a claim "with a protective filing date in July of '22 and an alleged onset date about a year earlier in August." (Tr. 162). The ALJ's administrative decision states Dobbins filed for benefits on July 25, 2022, alleging disability beginning August 10, 2021. (Tr. 123). The court can discern no direct explanation in the record for these discrepancies. However, Dobbins does not contest that she at some point amended her alleged onset date to August 10, 2021, and the discrepancy between a filing date of July 25, 2022, and a filing date of August 17, 2022, bears no dispositive significance.

disc disease status post discectomy at L5-S1 with subsequent revision, mild cervical spine degenerative disc disease, undifferentiated connective tissue disorder, and obesity. (Tr. 128). At step three, the ALJ concluded Dobbins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 129).

At step four, the ALJ found Dobbins exhibited the residual functional capacity ("RFC") to perform light work,

> except she could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; she could frequently balance; she should avoid ladders, ropes, scaffolds, and unprotected heights; she could have occasional exposure to extreme temperatures and vibration; she could understand, remember, and carry out simple instructions; she could have casual and infrequent contact with the public; and any changes in the work environment should be gradual and infrequent.

(Tr. 136).

The ALJ determined Dobbins had no past relevant work. (Tr. 147). However, considering Dobbins's age, education, work experience, and residual functional capacity, she could perform jobs existing in significant numbers in the national economy, including marker, routing clerk, and assembler. (Tr. 147-48). Therefore, the ALJ concluded Dobbins "was not under a disability … at any time from … the alleged onset date [to] … the date last insured." (Tr. 149).

Dobbins filed a request for review of the ALJ's decision before the Appeals Council. (Tr. 322-24). On November 5, 2024, Dobbins submitted additional medical records for the Appeals Council's review. (Tr. 8-9). On that same date, the Appeals

Council denied Dobbins's request for review, which deems the ALJ's decision the Commissioner's final decision.  (Tr. 1-4).  Dobbins filed the Complaint in the present case on January 9, 2025.  (Doc. 1).

## ANALYSIS

In this appeal, Dobbins argues the ALJ's decision does not enjoy substantial evidentiary support; the ALJ erred by failing to account for her absenteeism in assessing her RFC; and the Appeals Council erred when it denied review despite receiving additional evidence.  For the reasons discussed below, the undersigned concludes none of those contentions warrants reversal.

**I.    THE ALJ PROPERLY APPLIED THE ELEVENTH CIRCUIT'S PAIN STANDARD AND REACHED A RESIDUAL FUNCTIONAL CAPACITY FINDING SUPPORTED BY SUBSTANTIAL EVIDENCE.**

Dobbins first asserts the ALJ's application of the Eleventh Circuit's "pain standard" lacked substantial evidentiary support.

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Wilson*[ *v. Barnhart*], 284 F.3d [1219,] 1225[ (11ᵗʰ Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11ᵗʰ Cir. 2021).  A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11ᵗʰ Cir. 1991) (citation

omitted).

Social Security Ruling ("SSR") 16-3p mandates the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, *7. An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Dobbins testified she stopped working due to back pain and anxiety.[3] (Tr. 167-68). A July 28, 2021, back surgery provided no relief. An August 27, 2023, surgery exacerbated her condition. Six weeks after that surgery, she informed the surgeon

---

[3] Dobbins does not challenge the ALJ's findings about the functionally limiting effects of her mental impairments.

8

"everything was okay," but she still experienced "a little bit of pain." (Tr. 168). She underwent physical therapy, which did not improve her condition, and she arranged a follow-up with the surgeon the day after the administrative hearing. (*Id.*).

Because of her back condition, she can stand in one spot for 20 minutes before needing to use a heating pad to ease the pain. She cannot lift anything over 20 pounds, and she "feel[s] the pressure with anything over ten pounds." (Tr. 169-70). She can sit for 20 minutes before needing to stretch and walk. She will need to stretch and walk for 15-20 minutes before returning to a seated position. She suffers from undifferentiated connective tissue disorder, which causes chronic fatigue and muscle aches. Some days she does not feel like getting out of bed. Doctors told her she could not take any prescription pain medication along with Klonopin, a controlled substance, which she takes for anxiety. She chooses to endure the pain rather than discontinue Klonopin. (Tr. 171-73).

Dobbins lives with her husband and two children. She focuses her energy on ensuring her children have clean clothes for the next school day. Her 12-year-old daughter helps her put away groceries or remove heavy pots from cabinets. She testified, "I make sure that I have to do what I need to do as a mother," including washing clothes and cooking food. (Tr. 173). In between tasks, she sits down with her heating pad or jumps into a hot bath to relieve the pain. Her children ride a bus to church every Wednesday, but they do not participate in any other outside activities. Dobbins stays home as much as possible. She uses Facebook but no other social media

platforms.  She enjoys going outside, but she mostly just sits in a chair and watches other people undertake activities.  Dobbins pays bills, and grocery shops, online.  When she needs to shop in a store, she uses a mobile cart.  (Tr. 173-76).

The ALJ found Dobbins's medically determinable impairments could reasonably be expected to cause the symptoms she alleged.  However, Dobbins's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence.  (Tr. 138).  Rather, as set out in the RFC finding, the ALJ found Dobbins could perform a limited range of light work.  The ALJ considered the RFC finding "supported by the objective medical evidence, which does not corroborate the extent of [Dobbins's] allegations, and by [her] reported activities of daily living, which also contradict [her] allegations."  (Tr. 147).

The ALJ appropriately applied the Eleventh Circuit's standard for evaluating subjective symptoms, and despite Dobbins's contrary arguments, substantial evidence supports the ALJ's decision.

The ALJ acknowledged Dobbins suffered from degenerative disc disease and related pain.  (Tr. 139-41).  Before Dobbins's first lumbar surgery in August 2021, clinical records from Huntsville Hospital Spine and Neuro Center indicated tenderness in the left sacroiliac joint and greater trochanteric bursa and a positive straight leg raise test.  An x-ray exhibited mild degenerative disc disease and lateral scoliosis, and an MRI revealed disc herniation at L5-S1 with a free fragment on the left superiorly migrated.  (Tr. 139, 660-61).  Even so, clinical examinations revealed normal posture, normal gait

without an assistive device, normal heel to toe walking, normal range of motion in the spine and extremities, no tenderness on palpation of the spine, negative straight leg raise on the right, no hip pain with rotation, age-appropriate muscle bulk, and full muscle strength. (Tr. 659, 661). Two weeks after her first surgery, Dobbins experienced some problems with wound healing, yet she displayed normal spinal range of motion, negative straight leg raise bilaterally, and full muscle strength. (Tr. 662-65, 668, 670-73).

Dobbins underwent another MRI on January 24, 2023, which revealed mild facet degenerative changes at L3-4 and a small broad-based disc bulge with mild to moderate facet degenerative changes without significant stenosis at L4-5. As to the L5-S1, the MRI report stated: "There has been a left laminectomy. There is significant enhancing scar tissue around the left S1 nerve root and left epidural space. There is a small broad-based disc bulge. There are moderate facet degenerative changes. There is mild bilateral neural foraminal stenosis." (Tr. 877). A June 26, 2023, MRI displayed a large recurrent disc herniation of the left lumbar spine. (Tr. 879-81).

In August 2023, Dobbins again complained of lower back pain radiating into both buttocks and legs. An x-ray exhibited multi-level degenerative disc disease. She decided against a steroid injection, and Dr. Murray recommended a second surgery. Even so, the clinical examination revealed normal posture, non-antalgic gait, normal heel to toe walking, good spinal and extremity range of motion, no sacroiliac joint or trochanteric bursa tenderness bilaterally, negative Spurlings bilaterally, negative straight

leg raise test bilaterally, no pain with hip rotation bilaterally, age-appropriate muscle bulk, and full muscle strength. (Tr. 884-92).

She underwent a second surgery on August 28, 2023. (Tr. 882). At a two-week follow-up appointment, she reported doing well. At a six-week follow-up appointment, she reported mild lower back pain and no leg pain. At both appointments, clinical examination revealed normal spinal range of motion, negative straight leg raise test bilaterally, and full muscle strength. Dr. Murray recommended physical therapy. (Tr. 869-74).

Treatment records from Dobbins's rheumatologist also reveal normal clinical findings, including normal range of motion, strength, and sensation; no tenderness; and no swelling. (Tr. 698, 706, 832, 840, 851, 898, 1099, 1107, 1119, 1125, 1133, 1142-43).

The ALJ also acknowledged Dobbins received treatment for depression and anxiety. (Tr. 140-42). Some mental health treatment records described Dobbins as sad, anxious, and easily distracted. Still, the records consistently stated Dobbins exhibited cooperation, normal psychomotor activity, normal speech, linear and goal-directed thought process, no suicidal or homicidal ideation, no psychotic thoughts, intact cognition, and intact judgment and insight. (Tr. 714, 716, 719, 722, 725, 728, 731, 734, 737, 740, 743, 749, 752, 755, 758, 761, 764, 767, 770, 773, 861). Treatment records from non-mental-health providers also reveal normal mental health findings, though Dobbins sometimes reported symptoms of depression, anxiety, and sleep problems. (Tr. 801, 805, 808, 832, 840, 851, 898, 1027, 1037, 1042, 1107, 1119).

These clinical findings, in addition to the evidence discussed below, provide substantial evidence supporting the ALJ's decision. Dobbins would interpret the evidence differently, but the court may not reweigh the evidence or substitute its judgment for that of the ALJ when the ALJ's decision enjoys substantial evidentiary support. *See Winschel*, 631 F.3d at 1178; *Werner*, 421 F. App'x at 939. The remainder of the analysis addresses Dobbins's arguments against upholding the ALJ's decision.

### A.    The ALJ Properly Considered the Opinions of the State Agency Physicians.

In reaching the RFC finding, the ALJ relied upon the assessments of the state agency medical consultants.[4] On April 18, 2023, Dr. Robert Haas reviewed Dobbins's medical records and concluded Dobbins's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, yet the objective medical evidence alone did not substantiate her statements about the intensity, persistence, and functionally limiting effects of her symptoms. Dobbins's statements about her symptoms and functional limitations were partially consistent with the record evidence.

Dr. Haas assessed that Dobbins could occasionally lift and carry up to 20 pounds, and she could frequently lift and carry up to ten pounds. She could perform unlimited pushing and pulling movements in her upper and lower extremities, within the lift-and-carry limitations. She could stand and/or walk for a total of six hours in an eight-hour

---

[4] Pursuant to Social Security regulations, an ALJ should consider opinions from state agency medical consultants like other medical evidence, as such consultants "are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1).

workday, and she could sit for a total of six hours in an eight-hour workday. She could never climb ladders, ropes, or scaffolds; she could frequently balance; and she could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl. She suffered no manipulative, visual, or communicative limitations. She could tolerate unlimited exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, but she should avoid concentrated exposure to extreme hot, extreme cold, vibration, and hazards such as machinery and heights. Dr. Haas noted that, despite Dobbins's history of a L4-5 microdiscectomy, she could independently perform all activities of daily living, and a lumbar MRI revealed mild degenerative disc disease with no significant stenosis. (Tr. 213-15).

On October 25, 2023, at the reconsideration level, Dr. Krishna Reddy reviewed Dobbins's medical records and assessed the same functional limitations as Dr. Haas. (Tr. 229-32).

The state agency assessments persuaded the ALJ for the following reasons:

Dr. Haas and Dr. Reddy reviewed the medical evidence and determined that the claimant's degenerative disc disease is a severe impairment . . . . Dr. Haas and Dr. Reddy considered the medically determinable impairments, along with physical findings, abnormal imaging studies, and lumbar studies when assessing the residual functional capacity.

[Their opinions are] also consistent with the evidence of record such as imaging studies prior to her surgical interventions. MRI of the lumbar spine showed disc herniation at L5-S1 with free fragment on the left superiorly migrated . . . . MRI of the lumbar spine showed large recurrence of herniated disc at L5-S1 with moderate stenosis not previously seen in other imaging. She was recommended L5-S1 microdiscectomy, but she opted to try epidural injections. However, she

14

underwent the recommended procedure, left L5-S1 partial hemilaminectomy medial facetectomy, foraminotomies, and microdiscectomy, in late 2023, after not following through with the steroid injections . . . . Postoperative examinations show that she had full strength, normal sensation, reflexes, grips strength, gait, range of motion and straight leg raise testing, and no pain with hip rotation. Rheumatology examination also show [sic] normal findings. The undersigned also considered the effects of her obesity on exertion, postural, and non-exertional functions. Because symptoms such as pain are subjective and difficult to quantify, regulations have identified the "type, dosage, effectiveness and side effects of any medication" as evidence that may be considered to determine if the capacity for basic work activities has been diminished. The effects of the claimant's substantial prescribed medication have been considered specifically, along with all of the available evidence in the claim, in evaluating the intensity and persistence of the claimant's symptoms and determining the extent to which these symptoms limit the capacity for work. The conclusions of [these evaluations] are reflected in the residual functional capacity given above.

(Tr. 143). Indeed, the ALJ's physical RFC findings mirrored the findings of Drs. Haas and Reddy. (Tr. 136).

Dobbins argues the ALJ erroneously credited the state agency physician opinions based upon postoperative findings from 2023. (Doc. 14, at 25-27). She cites post-operative physical therapy notes from October and November 2023 reflecting that she continued to experience low back pain, stiffness, and weakness after the surgery. (See Tr. 1046-76). However, those notes depicting subjective, self-reported symptoms do not contradict the postoperative examinations showing full strength, normal sensation, normal reflexes, normal grip strength, normal gait, full range of motion, negative straight leg raise testing, and no pain with hip rotation. (*See* Tr. 870-74).

Accordingly, the ALJ properly considered the opinions of the state agency physicians in assessing Dobbins's residual functional capacity.[5]

### B. The ALJ Did Not Improperly Prioritize Clinical Findings Over Objective Test Results.

Dobbins contends the ALJ "did not see the forest through the trees," as he "relied heavily on the reported front line clinical signs and favored them over the objective diagnostic results and resulting surgeries." (Doc. 14, at 27). However, there exists no legal authority to support Dobbins's assertion. The ALJ appropriately found Dobbins's medically determinable impairments could reasonably be expected to cause the symptoms she alleged, yet he also appropriately found Dobbins's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence.

As explicated more fully above, the ALJ appropriately relied upon clinical findings at medical visits, such as muscle strength, reflexes, grip strength, gait, range of motion, and straight leg raise testing to assess the functionally limiting effects of Dobbins's impairments. (*See* Tr. 139, 659-61, 662-65, 668, 670-73, 698, 706, 832, 840, 851, 869-74, 882, 884-92, 898, 1099, 1107, 1119, 1125, 1133, 1142-43). Notwithstanding the presence of degenerative disc disease or the need for further surgery, those functional limitations properly buttressed the ALJ's decision about

---

[5] To the extent Dobbins asserts she never recovered from her August 2023 lumbar surgery, this opinion addresses that argument more extensively in § III, *infra*.

Dobbins's ability to work pursuant to the substantial evidence standard. (*See* Tr. 145 ("Even when recent imaging studies of the lumbar spine show abnormal findings, orthopedic examination remained normal.")). *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she *has* varus leg instability and shoulder separation. However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard.") (emphasis in original); *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010) (diagnosis insufficient to establish disability); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006) (While a doctor's letter reflected diagnoses, "it does not indicate in any way the limitations these diagnoses placed on [the claimant's] ability to work, a requisite to a finding of disability.").

Dobbins cites *Fleming v. Earnhart*, 333 F. Supp. 2d 1221, 1226 (N.D. Ala. 2004), for the proposition that, "[w]here there are uncontradicted diagnostic tests and surgeries that objectively document the presence of medical conditions sufficient to give rise to disabling pain, the ALJ errs when they do not have a sufficiently articulated reason for discrediting the pain testimony." (Doc. 14, at 27). That decision does not alter the findings here because the ALJ sufficiently articulated his reasons for not fully accepting Dobbins's subjective complaints, principally via review of the record medical evidence, Dobbins's daily living activities, and the opinions of the state agency physicians. And substantial evidence supports the ALJ's rationale. In *Fleming*, by contrast, "[t]he ALJ's

articulated reasons for discrediting the plaintiff's pain testimony [were] not supported by substantial evidence." *Fleming*, 333 F. Supp. 2d at 1227.  The court distinguishes the other cases Dobbins cites for similar reasons.  *See Bloodsaw v. Apfel*, 105 F. Supp. 2d 1223, 1227 (N.D. Ala. 2000) (objective medical evidence, including findings of tenderness and diminished reflexes, supported the alleged extent of the claimant's pain).

Because the ALJ adequately explained why the record evidence did not support Dobbins's allegations of disabling pain, and substantial evidence supported the ALJ's explanations, the ALJ did not err by relying upon clinical findings to support his assessment of Dobbins's disability status.

## C.    The ALJ Properly Considered Dobbins's Activities of Daily Living.

Dobbins also argues the ALJ improperly considered her daily activities in assessing her disability status.  According to the ALJ, Dobbins's

> activities of daily living further diminish the persuasiveness of her allegations.  The claimant testified that she is able to care for her children, cook, attend church, use social media such as Facebook, pay bills online, and order groceries online for pick up using an electric cart.  Her written report indicates that she is able to care for her children, manage her personal care with some limitations, take medications without needing reminders, prepare simple meals, do household chores with breaks, drive and leave home unaccompanied, use a computer to shop online, pay bills, count change, handle a savings account, follow written and spoken instructions, get along with others, handle changes in routine, communicate with others by phone, text, mail and video chat, attend medical appointments, take her children to school, shop in stores, and go places without needing reminders . . . .  These activities of daily living are consistent with the ability to perform a range of light work and are directly contradictory to the claimant's allegation that she is [not] able to work in any capacity.

(Tr. 142).

Social Security regulations permit an ALJ to consider a claimant's daily activities when assessing subjective symptoms vis-à-vis the ability to work. *See* 20 C.F.R. § 404.1529(c)(3)(i). Yet, as numerous courts have cautioned, "'participation in everyday activities of short duration' does not disqualify a claimant from disability," as "'[i]t is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances.'" *Love v. Colvin*, No. 6:15-CV-338-WMA, 2016 WL 741974, at *5 (N.D. Ala. Feb. 24, 2016) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997); *Early v. Astrue*, 481 F. Supp. 2d 1233, 1238-39 (N.D. Ala. 2007)). Rather, an ALJ should rely upon evidence of a claimant's daily activities as a "basis to discredit a claimant's testimony when [his or] her daily activities demonstrate a higher level of functioning than [his or her] alleged disabling symptoms would allow." *Love*, 2016 WL 741974, at *5.

Consistent with that legal guidance, the ALJ did not improperly equate Dobbins's limited daily activities with the ability to perform full-time work activity. Rather, he properly assessed the consistency of Dobbins's activities with her testimony about her limitations by concluding those activities "further diminish the persuasiveness of Dobbins's allegations" of disabling pain. (Tr. 142).

Dobbins also argues the ALJ exaggerated the extent of some of her daily

activities.[6]  The Commissioner acknowledges the ALJ incorrectly found Dobbins could attend church.  (Doc. 17, at 12 n.2).  Rather, Dobbins testified her children attend church, and they receive a ride via a church bus.  (Tr. 174).

Dobbins also disputes the ALJ's statement that she can care for her children and cook, as Dobbins explained during the administrative hearing that she often needs help performing those tasks, and doing so exacerbates her pain. However, the ALJ partially relied upon Dobbins's 2/3/2023 Function Report for his assessment, in which she reported she cares for her children by transporting them to and from school as well as doctor and dentist appointments; she feeds and bathes them; and she assists them with homework.  (Tr. 387).

In any event, any mischaracterization of testimony by the ALJ, along with the ALJ's factual error about Dobbins's church attendance, does not undermine the substantial evidence supporting the ALJ's decision.  The ALJ did not rely solely upon his assessment of Dobbins's daily activities to support the RFC finding, or to assess the consistency of Dobbins's symptom complaints with the record.  Because substantial medical evidence supported the ALJ's RFC finding, any misstatements by the ALJ of Dobbins's daily activities do not result in error.  *See Byars v. Colvin*, No. 6:15-CV-00303-KOB, 2016 WL 4137981, at *11 (N.D. Ala. Aug. 4, 2016) (in discussing the claimant's pain allegations, the ALJ did not improperly omit the claimant's testimony regarding

---

[6] Dobbins specifically challenges the ALJ's findings about her ability to attend medical appointments, and the court will address that challenge in due course.

specific limitations on her daily living activities because a Function Report contradicted her testimony); *Seagle v. Colvin*, No. 2:15-CV-00538-LSC, 2016 WL 1613053, at *6 (N.D. Ala. Apr. 22, 2016) ("[E]ven without the ALJ's consideration of Plaintiff's daily activities, there was ample evidence undermining Plaintiff's credibility, as discussed above, such as Plaintiff's limited and conservative medical treatment, normal examination findings, and poor work history."); *Hunter v. Colvin*, No. 4:13-CV-0391-SLB, 2014 WL 4458887, at *9-10 (N.D. Ala. Sept. 8, 2014) (contrary to the ALJ's conclusion, the claimant's daily living activities did not undermine her subjective complaints; however, substantial evidence nevertheless buttressed the ALJ's decision because he also relied upon sufficient, objective medical evidence to render his adverse credibility determination).

In summary, any error in the ALJ's assessment of Dobbins's daily activities does not mar the substantial evidence determination.

### D.    The ALJ's Other Factual Findings Enjoy Substantial Evidentiary Support.

Dobbins challenges the accuracy of other factual findings by the ALJ. She asserts the ALJ inaccurately stated she underwent a left L4-5 microdiscectomy in August 2021 after failing conservative treatment with medication, as she actually underwent the surgery on July 28, 2021, then underwent a debridement for infection in August 2021. (Doc. 14, at 28-29; *see* Tr. 139). However, even Dobbins acknowledges this mistake is "minor," and the court finds the minor error inconsequential to any of the ALJ's

findings.  (Doc. 14, at 29).

Dobbins also challenges the ALJ's finding that she returned to Huntsville Hospital Spine and Neuro Center "after a 2-year gap in treatment," as she received treatment from other sources during that two-year period.  (Doc. 14, at 29-30; *See* Tr. 139).  However, Dobbins acknowledges the ALJ could have intended to convey that she "did not return to Huntsville Hospital Spine and Neuro Center for two years." (Doc. 14, at 29 n. 2).  Moreover, the ALJ did not rely upon the two-year gap in treatment in assessing the consistency of Dobbins's subjective complaints with the medical record, or in any of his findings about Dobbins's functional abilities.  As such, any factual error does not deprive the ALJ's decision of substantial evidentiary support.

Furthermore, Dobbins complains about the ALJ's failure to mention the results of a January 24, 2023, MRI.  However, applicable law does not require an ALJ to "discuss every piece of evidence if the ALJ's decision is not a broad rejection and there is enough for [the court] to conclude that the ALJ considered the claimant's medical condition as a whole."  *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir. 2024) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Jamison v. Bowen*, 814 F.2d 585, 590 (11th Cir. 1987)).  The January 24, 2023, MRI results do not undermine the substantial evidence supporting the ALJ's decision.  The MRI revealed "mild narrowing of the L5/S1 disc space," with "discogenic changes of these endplates," normal disc space heights at other levels, no compression fracture, normal alignment, and no significant spinal cord abnormality.  The radiologist also observed at L5-S1: "There has

been a left laminectomy. There is significant enhancing scar tissue around the left S1 nerve root and left epidural space. There is a small broad-based disc bulge. There are moderate facet degenerative changes. There is mild bilateral neural foraminal stenosis." (Tr. 877). When Dr. Rhett Murray, Dobbins's spinal surgeon, evaluated the MRI, he noted "degenerative changes of the disc," but he did "not see any obvious disc herniation." He recommended physical therapy. (Tr. 878). None of those findings support an inference of disabling limitations, and the record reveals Dobbins's condition worsened by the time of her next MRI on June 26, 2023, necessitating surgery. (Tr. 879-81).

In summary, none of Dobbins's challenges to the ALJ's factual findings undermine the substantial evidence supporting the administrative decision.

## II.    THE ALJ DID NOT ERR BY FAILING TO INCLUDE A LIMITATION FOR EXCESSIVE ABSENTEEISM IN HIS RFC FINDING.

Dobbins contends the ALJ erred by failing to account for her excessive absenteeism. On January 28, 2024, Taylor Barrett, a nurse practitioner at Carr Mental Wellness, opined Dobbins would miss more than three days of work each month. (Tr. 1259).[7] Barrett's assessment did not persuade the ALJ, as it lacked support in Barrett's

---

[7] Contemporaneously on January 28, 2024, Barrett completed a Mental Health Source Statement on which she reported Dobbins would miss 75 days of work in a 30-day period due to psychological symptoms. (Tr. 934). That discrepancy indisputably represents a clerical error, and Barrett likely intended to indicate Barrett would miss 75% of the workdays in a 30-day period, particularly given Barrett's response on another question that Dobbins would remain off-task 75% of the time during an eight-hour day.

clinical records reflecting normal findings and improvement with medication, exhibiting no side effects, the normal findings in other providers' records, the lack of emergency department visits or inpatient psychiatric care, and the lack of referral for additional psychiatric care. Moreover, the ALJ noted Barrett limited her treatment records to psychotherapy, not physical impairments, and Barrett's findings conflicted with other record evidence. (Tr. 146-47).

Dr. Janie Teschner, who performed a consultative examination on March 11, 2024, opined Dobbins would miss more than ten days of work in a thirty-day period due to her physical symptoms. (Tr. 1253). The ALJ concluded Dr. Teschner's examination "was completed after the date last insured and is not representative of [Dobbins's] functioning during the period in question." (Tr. 145). Dobbins did not challenge the ALJ's finding about the temporal relevance of the opinion.

The ALJ also rejected Dr. Teschner's opinion as inconsistent with orthopedic, rheumatology, and primary care examinations exhibiting normal clinical findings, including examinations occurring during the same time period of Dr. Teschner's opinion, lack of emergency department visits or inpatient care, and the longitudinal picture depicted by treating source findings. (*Id.*).

Dobbins argues the ALJ erred in rejecting Barrett's and Dr. Teschner's assessments about her excessive absenteeism. She contends a significant limitation due to absenteeism may have necessitated a finding of disability, as the vocational expert testified during the administrative hearing that employers generally tolerate no more

24

than one absence per month. (Tr. 180). However, the ALJ's decision to reject Barrett's and Dr. Teschner's assessments did not result in error, as the ALJ properly found those assessments unpersuasive.

Social Security regulations state an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion. *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and an ALJ must explain the consideration of those factors. *Id.* § 404.1520c(b)(2). Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations. *Id.* § 404.1520c(c)(3)-(5). The ALJ "may" conclude that an examining medical source will understand the

claimant's impairments better than a medical source who only reviews evidence in the claimant's file. *Id.* § 404.1520c(c)(3)(v). The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c)(5).

Consistent with these regulatory requirements, the ALJ explained that Barrett's and Dr. Teschner's opinions did not persuade him because the opinions lacked support in the providers' own records, and they conflicted with other record evidence. Substantial evidence supported the ALJ's finding, as the record abounds with normal clinical findings as to Dobbins's physical and mental functioning.

Dobbins also argues that, regardless of Barrett's and Dr. Teschner's assessments, "the ALJ should have addressed and included an absenteeism limitation in the RFC," because "[w]here a claimant has one or more severe impairment[s] that would result in unexcused absenteeism, the ALJ must account for it." (Doc. 14, at 33-34). However, the authority Dobbins cites for that proposition does not support her proposition.

In *Samuels v. Acting Comm'r of Soc. Sec.*, 959 F.3d 1042 (11th Cir. 2020), the Eleventh Circuit found the ALJ erred by failing to query a vocational expert about a claimant's need for unexcused absences or time spent off-task due to a bipolar disorder. *Id.* at 1047. However, in that case the ALJ credited the opinions of two medical experts who concluded the claimant would suffer such limitations as a result of her mental

impairment. *Id.*  In contrast, in the present case, the ALJ rejected medical opinions suggesting the need for excessive absences and relied instead upon the opinions of the state agency medical examiners, which did not include any restrictions for absenteeism. *See Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 903 (11th Cir. 2012) (quoting *Crawford*, 363 F.3d at 1161 ("The ALJ is not required to include findings in the hypothetical that the ALJ has found to be unsupported.")).  As previously discussed, substantial evidence supported the ALJ's determination.

In *Johnson v. Berryhill*, 382 F. Supp. 3d 1200 (N.D. Ala. 2019), the ALJ improperly discounted the claimant's PTSD symptoms by focusing upon his "'non-complian[ce] with seeing his social worker and therapist'" without ascertaining the reasons for the missed appointments.  *Id.* at 1211 (alteration in original).  However, in this case the ALJ did not rely upon Dobbins's failure to attend medical appointments as grounds for finding her subjective complaints unpersuasive.  Rather, the ALJ considered Dobbins's *ability* to attend medical appointments as one reason to find her conditions did not impair her as severely as she alleged.  (Tr. 133-35, 137, 142).

For similar reasons, the ALJ's decision did not run afoul of SSR 18-3p, which discusses how the Commissioner should address a claimant's failure to follow prescribed treatment.  That ruling only comes into play when the Commissioner determines

> an individual who meets the requirements to receive disability . . . benefits
> will not be entitled to these benefits [because] the individual fails, without
> good cause, to follow prescribed treatment that [the Social Security

Administration] expect[s] would restore his or her ability to engage in substantial gainful activity (SGA).

SSR 18-3p, at *2; *see also Epps v. Saul*, No. 7:20-CV-00051-MHH, 2021 WL 1338285, at *9 (N.D. Ala. Apr. 9, 2021) (citing SSR 18-3p ("Before the Commissioner may consider whether a claimant failed to follow prescribed treatment, the record must demonstrate that the claimant is otherwise entitled to disability benefits under Titles II or XVI of the Act, that there is evidence that the claimant's medical sources prescribed treatment for the medically determinable impairment upon which the disability finding is based, and that there is evidence that the individual did not follow the prescribed treatment.")).

Here, the ALJ did not conclude any failure to comply with treatment resulted in Dobbins's suffering of a disability. To the contrary, as Dobbins acknowledges, "the ALJ repeatedly found that [her] ability to 'attend medical appointments' is one of her strengths." (Doc. 18, at 12). Therefore, the ALJ did not need to evaluate Dobbins's failure to comply with treatment pursuant to SSR 18-3p.

Finally, the record does not support Dobbins's contention that application of SSR 18-3p would reveal her "mental and physical conditions are the cause of her failure to attend appointments." (Doc. 14, at 37). On September 24, 2020, Dr. Randall Beyl at Marshall Rheumatology Clinic ordered a contrast chest CT, but Dobbins "was a no show." (Tr. 704). On July 7, 2022, Dr. Beyl stated Dobbins returned to his office "after being lost to follow-up x21 months." (Tr. 695). He observed that "[b]ecause of her severe noncompliance with appointments I think she is a very poor patient for chronic

28

immune suppression unless her compliance improves." (Tr. 693). He repeated that observation on January 10, 2023, and he also noted Dobbins had not undergone an eye examination, as required for her medication regimen, since her last appointment. (Tr. 896). He noted Dobbins had canceled three appointments in the prior three months and failed to show up for one appointment. He observed:

> Compliance with appointments is a monumental issue with her which makes it difficult to provide long-term medication that would need close monitoring. In the last few visits we had a very pointed discussion that I cannot take care of her if she cannot show up for any appointments. Since last visit feeling "NO BETTER." She cites continued pain, chronic fatigue and tells me that she is "tired of hurtin' and feeling give out." She has not had an eye exam in the interim. Currently taking Hydroxychloroquine 200 mg BID. Due to her noncompliance and vague symptomology I do not feel strongly about adding more immunosuppression at this point. If hydroxychloroquine is ineffective and we have strong evidence of end organ involvement and she can be compliant with appointments may consider other DMARD's in the future. I offer to try elavil but she refused and states that "only narcotics help me." I reminded her I cannot/ will not do this for her for many reasons including noncompliance with appointments, lack of a solid indication. She can discuss further with primary care physician. If she becomes more compliant with appointments and has an objective organ manifestation that would warrant immunosuppression [I] would consider other mucin present in the future; I will not judge her need for immunosuppression based solely upon pain. The next time she either no shows or is late for an appointment I think it would be best to terminate her care as thus far I have not been able to provide much care for her.

(Tr. 899).

In addition to these problems with Dr. Beyl, Dobbins failed to attend an appointment at Marshall Medical Center South on June 22, 2022. (Tr. 820). On June 29, 2023, Dr. Murray reviewed a June 26 MRI and stated his intent to "bring [Dobbins]

back in to discuss treatment options." He cautioned that "[i]f she does not show, she will no longer be welcome in this office." (Tr. 881).

None of the records discussing Dobbins's problems attending medical appointments even surmises, much less establishes, that her physical or mental condition prevented her attendance. Moreover, in her Function Report, Dobbins stated she attends her own doctor appointments and transports her children to their doctor and dentist appointments. (Tr. 387, 389). She even stated she attends doctor appointments "on a regular basis," and she can do so independently and without reminders. (Tr. 390). Dobbins's self-reported ability to attend medical appointments undermines her contention that her mental and physical health prevented her attendance.

For the above reasons, the ALJ did not err by failing to include an attendance limitation in his RFC finding.

## III. THE APPEALS COUNCIL PROPERLY CONSIDERED NEW EVIDENCE DOBBINS PRESENTED AFTER THE ADMINISTRATIVE HEARING.

A claimant may present new evidence at each stage of the administrative process, including before the Appeals Council. *Pupo v. Comm'r, Soc. Sec. Admin.*, 17 F.4th 1054, 1063 (11th Cir. 2021) (citing *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007)). The Appeals Council will review such submissions if it receives additional "evidence that is new, material, and relates to the period on or before the date of the [ALJ] hearing decision, and there is a reasonable probability that the

additional evidence would change the outcome of the decision." 20 C.F.R. §
404.970(a)(5). "'[W]hen the Appeals Council erroneously refuses to consider evidence,
it commits legal error and remand is appropriate.'" *Pupo*, 17 F. 4th at 1063 (citing
*Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1320 (11th Cir. 2015) (alteration in
original)).

Dobbins submitted additional medical evidence to the Appeals Council after the
ALJ rendered his decision. The Appeals Council found:

> You submitted 6 pages of treatment records from Marshall
> Neurology center dated July 23, 2024; 6 pages of treatment records from
> Carr Mental Wellness dated March 18, 2024 to July 10, 2024; and 47 pages
> of treatment records from Huntsville Hospital System dated February 15,
> 2024 to June 4, 2024. The Administrative Law Judge decided your case
> through September 30, 2023. This additional evidence does not relate to
> the period at issue. Therefore, it does not affect the decision about
> whether you were disabled beginning on or before September 20, 2023.

(Tr. 2). In the same vein, the Appeals Council determined the additional evidence did
"not provide a basis for changing the Administrative Law Judge's decision." (Tr. 1).
The Appeals Council advised Dobbins she could file a new claim if she desired
consideration of her disability status post-September 20, 2023. (Tr. 2).

The new evidence submitted to the Appeals Council includes a March 21, 2024,
treatment note from Huntsville Hospital Spine and Neuro Center. Dobbins
complained of recurrent lower back pain into both legs, with the left greater than the
right. She also reported joint pain, joint stiffness or swelling, and muscle pain or
cramps. During the clinical examination, Dobbins displayed normal posture, non-

antalgic gait without an assistive device, normal spinal range of motion, full range of motion in the bilateral upper and lower extremities without pain, no sacroiliac joint or greater trochanteric bursa tenderness, negative straight leg raise test, no pain with hip rotation, and age-appropriate muscle bulk. Dobbins also displayed full muscle strength in all extremities, except 4/5 strength in the left tibialis anterior and 4/5 strength in the left extensor hallucis. Dr. Murray noted a February 15, 2024, lumbar spine MRI revealed a large recurrent herniated nucleus pulposus at L5-S1 on the left. The physician assessed prolapsed lumbar intervertebral disc, with an onset date of July 28, 2021, and a lumbar disc prolapse with radiculopathy, with an onset date of August 28, 2023. (Tr. 68-71).

Dr. Murray further provided:

Ms. Dobbins returned for recheck. She has had recurrence of her back pain, now going into both legs, more on the left than the right, all the way to the foot. This has been going on for some months. She has tried medications without relief. On exam, she has positive straight leg raise more on the left than the right. She has weakness of the anterior tibialis, grade 4/5; extensor hallucis longus 4+/5, both on the left.

Her lumbar spine films ordered and interpreted by me in clinic today show loss of disc space height at L5-S1. There is no sign of instability.

Her new MRI scan done February 15, 2024, at Marshall Medical Center South shows a very large recurrent disc herniation at L5-S1 to the left and postoperative changes. This is now her third herniation at the same level. The disc is not healing and sealing itself. I have recommended a transforaminal lumber interbody fusion at L5-S1. Surgery was discussed, including the risks of hardware failure and the need to wear a brace for three months. The risks of CSF leak, nerve damage and hemorrhage were discussed. She agrees to the plan.

(Tr. 71).

Dobbins underwent an L5-S1 fusion surgery on May 22, 2024. (Tr. 73). Chronicling the reason for the procedure, Dr. Murray explained Dobbins "is a 33-year-old female [who] has had multiple recurrent disc herniations at L5-S1 toward the left[;] it was felt a transforaminal lumbar interbody fusion was needed." (*Id.*).

During a June 4, 2024, follow-up with Dr. Murray, Dobbins reported "doing well" with "no bilateral leg pain." (Tr. 64). However, she reported joint pain, joint stiffness or swelling, and muscle pain or cramps. During the physical examination, Dobbins displayed normal spinal range of motion, negative straight let raise test, and full muscle strength. (Tr. 65-66).

During a July 10, 2024, office visit to Carr Mental Wellness, Dobbins reported chronic pain and fatigue to Barrett, who documented Dobbins's interim history as follows:

> Breanna Dobbins comes in for her follow up. She had surgery May 22nd. She had a rod and screws placed in her back. She had a spinal fusion. She report[s] her doctor is no longer giving her pain medication. She is not fully healed. She does have pain from surgery. The areas in her back that were hurting prior to her surgery has [sic] improved. She was told her L5 and S1 was [sic] in pieces. Breanna Dobbins has never had trauma to her back or neck but she feels like these issues are related to her autoimmune disorder.
>
> She reports "it's her whole" body, she reports having a very ruff [sic] 6 weeks. She has yelled a lot and cried a lot. [S]he has had to reach out to different people to do simple things for her like going to the restroom. She reports mentally life has been hard. She is still unable to bend down and pick things up. She will be in a brace for another 6 weeks

at least. She follows up the 16th and will find out for sure. She reports being exhausted in all [a]spects. She feels like nothing she does is good enough. She did need pain medication and did not take her klonopin as often. She has not had this in her system as much and this extremely elevated her anxiety. She reports her doctor is no longer prescribing her pain meds. She is at an extremely low place today. She has had issues with her executive functioning as well.

(Tr. 61-62). Barrett primarily assessed Dobbins's mental functioning, but she also stated Dobbins's "[p]sychomotor activity is within normal limits." (Tr. 62).

Dobbins contests the Appeals Council's finding that this additional evidence did not relate back to the time period prior to her date last insured. Dobbins argues the new evidence bears chronological relevance because the necessity for an additional surgery contradicts the ALJ's finding that her August 28, 2023, spinal surgery adequately treated her symptoms.

Dobbins underwent a left L5-S1 partial hemilaminectomy medial facetectomy, foraminotomies, external neurolysis, and microdiscectomy on August 28, 2023. (Tr. 882-83). The ALJ observed her postoperative examinations displayed

normal strength and range of motion, normal reflexes, and negative straight leg raise testing contrary to her initial physical therapy evaluation of decreased strength and range of motion. . . . By the end of her tenth physical therapy session, she demonstrated improved stabilization strength and activity tolerance advancing exercise program, despite her persistent pain rated between 6 and 9 on a 10-point scale . . . . She partially completed her goals of improving strength and range of motion and decreasing pain. However, there is no evidence of subsequent physical therapy after November 2023, even though she was recommended additional sessions.

(Tr. 140). The ALJ relied upon similar postoperative findings – "full strength of all

extremities, normal range of motion, normal grip strength, intact sensation, negative straight leg testing, and no pain with hip rotation" – when explaining his conclusion that the objective medical evidence did not support Dobbins's allegations of disabling limitations in sitting, standing, walking, bending, and lifting due to her lumbar spine condition. (Tr. 141).

In acknowledging the persuasiveness of the stage agency medical consultants' opinions that Dobbins could perform a limited range of light work activity, the ALJ again noted that the post-operative findings from Dobbins's August 2023 lumbar surgery "show that she had full strength, normal sensation, reflexes, grips strength, gait, range of motion and straight leg raise testing, and no pain with hip rotation." (Tr. 143). Indeed, Dr. Krishna Reddy, who assessed Dobbins's limitations based upon the medical record as of October 25, 2023, stated the following about the notes from Dobbins's October 17, 2023, follow-up appointment with Dr. Murray:

> While the most recent [follow-up] is after [Dobbins's date last insured] expired, the exam findings do support ongoing healing and improvement in her Lspine with mostly back to [normal] exam findings and was told to [follow up] only as needed, suggesting expected course of healing without need for ongoing [treatment]. [Dobbins] is expected to continue to improve and a course of 4 [weeks] of PT was prescribed. As of 10/24/23, [Dobbins] has not yet started PT but expects to start soon.

(Tr. 231).

Pursuant to Eleventh Circuit authority, "'[m]edical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant.'" *Howze v. Soc. Sec. Admin.*, No. 21-11066, 2022 WL 152236, at *2 (11th Cir. Jan. 18, 2022)

(quoting *Washington*, 806 F.3d at 1322).   In the decision, the Eleventh Circuit the standard for evaluating chronological relevance:

> In *Washington*, the claimant submitted to the Appeals Council a psychologist's evaluation and accompanying opinion about the degree of the claimant's mental limitations, which were prepared seven months after the ALJ's decision. *Id.* at 1319.   We concluded that the psychologist's materials were chronologically relevant because: (1) the claimant described his mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision. *Id.* at 1322-23 (limiting its holding to "the specific circumstances of this case").

> But we have also held that the Appeals Council correctly declined to consider new medical records because the records were "about a later time" than the ALJ's decision, and, therefore, did not affect the decision about whether the claimant was disabled during the relevant period. *Hargress[ v. Soc. Sec. Admin., Comm'r*], 883 F.3d [1302,] 1309[ (11th Cir. 2018)]. In *Hargress*, we held that the new records were not chronologically relevant because nothing in them indicated that the doctor, who did not treat the claimant during the relevant period, had reviewed the appellant's medical records, or that the information in the new records related to the period at issue. *Id.* at 1309-10.

*Howze,* 2022 WL 152236, at *2.

The additional records submitted in this case bear more similarity to the records described in *Hargress* than those described in *Washington*.   Notably, the records do not reflect Dobbins's condition remained unchanged from the time period before the ALJ's decision.   During the first months after Dobbins's August 28, 2023, surgery, she displayed good clinical findings, such as normal strength and range of motion, normal reflexes, and normal straight leg raise testing.   In the newly-submitted evidence, Dr. Murray's March 21, 2024, notes described the presence of Dobbins's back pain as a

36

"recurrence," and he added that the pain "now" shoots into her legs, indicating a change from her pre-operative condition.  X-rays exhibited loss of disc space height at L5-S1, again indicating a change in her condition.  Dr. Murray interpreted Dobbins's February 15, 2024, MRI as exhibiting a "recurrent" disc herniation, indicating that the herniation dissipated but then returned.  (Tr. 71).

As the record depicts Dobbins's condition worsened after her date last insured, the later medical records do not bear chronological relevance to the ALJ's decision finding her not disabled as of that date.  *See Phillips v. Soc. Sec. Admin., Comm'r*, 833 F. App'x 308, 321 (11th Cir. 2020) (records indicating that the claimant's knee pain progressively worsened after the ALJ's decision did not bear chronological relevance); *Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966, 969 (11th Cir. 2018) (medical evaluation related "to the worsening of a condition or the onset of a new condition after the date of the ALJ's decision" did not bear chronological relevance).

The court may conclude assessment of the newly-submitted evidence with the finding of chronological irrelevance, yet the evidence also does not reasonably alter the ALJ's decision.  Dobbins argues the court should not assess whether the evidence could reasonably change the outcome of the ALJ's decision, as court "review of the Appeals Council's decision must be limited to the particular holdings and rationale espoused by the Appeals Council," and "[t]he Appeals Council's rationale for denying review was only for a lack of chronological relevance."  (Doc. 18, at 15).

Dobbins relies upon the Supreme Court's decision in *Sec. & Exch. Comm'n v.*

*Chenery Corp.*, 318 U.S. 80, 88 (1943), which held that

> [i]f an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.

*Id.* at 88.

The Seventh Circuit, in an unpublished opinion, has interpreted *Chenery* to prevent district court review of the materiality of additional evidence when the Appeals Council determined the additional evidence did not bear chronological relevance. *See Kennedy v. Kijakazi*, No. 22-2258, 2023 WL 1990303, at *3 (7th Cir. Feb. 14, 2023) (Though the Commissioner asserted "that the Appeals Council's decision should be upheld on harmless-error grounds, because the evidence has no reasonable possibility of changing the outcome of the case[, t]he Appeals Council . . . never said any such thing." Therefore, the Commissioner's argument "would have no purchase," as the reviewing court "strictly limits itself to the reasons provided by the agency.") (citing *Chenery*, 318 U.S. at 95).

However, the Eleventh Circuit, also in an unpublished opinion, has interpreted *Chenery* differently. The Court observed that a federal court, as part of its *de novo* review, "may consider factors that the Appeals Council did not when it refused to consider new evidence." *Reese v. Soc. Sec. Admin., Comm'r*, No. 24-13759, 2025 WL 3022648, at *2 (11th Cir. Oct. 29, 2025). The claimant argued that such a conclusion would conflict with

*Chenery*, but the Eleventh Circuit rejected that argument, as the prior panel precedent rule bound the Court to its previous decisions in *Washington v. Soc. Sec. Admin., Com'r*, 806 F.3d 1317, 1321 (11th Cir. 2015), and *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1310 (11th Cir. 2018), in which the Court "considered both chronological relevance and materiality when the Appeals Council only considered chronological relevance." *Reese*, 2025 WL 3022648, at *2 n.2.[8] Abiding by the Eleventh Circuit's interpretation, this court will consider the materiality of the new evidence even though the Appeals Council addressed only its chronological relevance.

Upon review of the additional evidence, the court concludes it would present no reasonable probability of changing the outcome of the disability decision. As previously discussed, the additional records reflect that Dobbins's condition worsened after her August 2023 surgery, necessitating another surgery in May 2024. The records related to Dobbins's insured period (*i.e.*, prior to September 30, 2023), reflect she recovered well immediately after the August 2023 surgery, displaying normal strength and range of motion, normal reflexes, and normal straight leg raise testing. Accordingly, the additional records simply do not speak to Dobbins's disability status prior to her date

---

[8] The Eleventh Circuit's "prior-panel-precedent rule dictates that 'a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this Court sitting en banc.'" *TL90108 LLC v. Ford*, 147 F.4th 1351, 1358 (11th Cir. 2025) (quoting *United States v. Armstrong*, 122 F.4th 1278, 1288 (11th Cir. 2024)). Even if the *Washington* and *Hargress* decisions improperly overlooked *Chenery*, the prior panel precedent rule does not countenance "an exception carved out for overlooked or misinterpreted Supreme Court precedent." *United States v. Fritts*, 841 F.3d 937, 942 (11th Cir. 2016) (citing *Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001)).

last insured.

Moreover, the additional evidence does not substantially support the existence of disabling limitations. Though Dobbins continued to complain of lower back pain after the ALJ's decision, and imaging revealed a large, herniated disc at L5-S1, the medical records reflect mostly normal clinical findings, with only slightly reduced strength in the lift tibialis anterior and left extensor hallucis. Within a month after Dobbins's third lumbar surgery in May 2024, physical examination revealed normal spinal range of motion, negative straight leg raise test, and full muscle strength. Though the evidence demonstrates Dobbins continued to experience a spinal impairment that caused some pain, it does not demonstrate the impairment caused disabling functional limitations, which constitutes the relevant inquiry for a disability determination. *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter*, 791 F.2d at 1547); *Mansfield*, 395 F. App'x at 531; *Osborn*, 194 F. App'x at 667. Accordingly, the new evidence does not present a reasonable likelihood of affecting the outcome of the disability decision.

As substantial evidence supports the ALJ's decision that the new evidence submitted to the Appeals Council did not relate back to the time period before Dobbins's date last insured, and the new evidence does not present a reasonable likelihood of changing the disability decision, the Appeals Council did not err in evaluating the new evidence.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision.

The court will enter a separate final judgment.

**DONE** this 13th day of March, 2026.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGI+STRATE
JUDGE

41